Lawrence J. BAUER and Robert J. Carpenter (Plaintiffs), Appellants,

v.

CITY OF BERKELEY, a Municipal Corporation, et al. (Defendants), Respondents.

No. 29351.

St. Louis Court of Appeals.

Missouri.

Sept. 20, 1955.

Motion for Rehearing or for Transfer to Supreme Court Denied Oct. 13, 1955.

---

Not to be reported in State Reports.

Meyer, Hoester & Coleman, Robert G. J. Hoester, Clayton, for appellants.

William J. Becker, Clayton, for City of Berkeley, Wilfred Bangert, Mayor, and members of Bd. of Aldermen and Wilfred Bangert, individually.

C. Willard Max and Richard W. Jacobsmeyer, Clayton, for respondent Asphalt Mix, Inc.

Elmer J. Meyer, Ferguson, and Theodore C. Bruere, St. Charles, for Missouri Petroleum Products Co. and St. Charles Quarry Co.

ANDERSON, Presiding Judge.

This is an appeal by plaintiffs from a final judgment dissolving a temporary injunction and denying a permanent injunction, and discharging the defendant City of Berkeley and John D. Taylor, City Clerk, on a citation for contempt.

The action was brought by Lawrence J. Bauer and Robert J. Carpenter, residents and taxpayers of the City of Berkeley, on their own behalf and on behalf of all others similarly situated, against the City of Berkeley, Wilfred Bangert, Mayor of said city, Roy H. Heitman, City Treasurer, and the following named members of the Board of Aldermen of said city: Louis Broyles, Henry Tungate, Glennon Ryan, Glennon Harris, Norman Champ, Fackney Smith, Bernard Gerling, Edward Walsh, Kenneth Grob, and Richard Loraine. Also joined as defendants were: Missouri Petroleum Products Company, a corporation; St. Charles Quarry Company, a corporation; Westlake Quarry and Material Company, a corporation; Asphalt Mix, Inc., a corporation; and Wilfred Bangert in his individual capacity.

The object of the suit was to enjoin the City of Berkeley and its officials from entering into any contracts for the improvement of the streets of said city under an alleged unlawful authority granted by the Board of Aldermen on April 15, 1953, from expending city funds, and from issuing special tax bills for work performed on certain streets of said city. By said petition plaintiffs also sought a restraining order against the private corporations above named, and Wilfred Bangert in his individual capacity, from doing further work under said alleged unlawful authority and from issuing any special tax bills as contractors for said improvement. The petition prayed that on final hearing the defendants, and each of them, be permanently enjoined from acting or proceeding under or in accordance with said alleged unlawful authority.

Relief was sought on the ground that the Mayor and Board of Aldermen in authorizing and making said improvements had proceeded contrary to law in that they had failed to comply with the provisions of Sections 8.250, 88.687, and 88.700 RSMo 1949, V.A.M.S., thus depriving plaintiffs and other taxpayers of due process of law in that they had not been accorded the opportunity, as provided by said statutes, (a) to be notified that said improvements were a necessity; (b) to protest the improvements if they so desired; (c) to receive the benefits to be derived from competitive bidding for the aforementioned improvements; and (d) to have public funds expended according to law.

The theory of the defense was that the work performed on said streets, under the authority granted by the Board of Aldermen, consisted merely of repairs which, under Section 88.703 RSMo 1949, V.A.M.S., could be lawfully made without any of the formalities required by the statutes upon which plaintiffs rely.

It appears from the evidence that prior to the events which gave rise to this lawsuit the streets of the City of Berkeley had been in very bad condition. On June 23, 1952, the Board of Aldermen adopted a

resolution concerning the repair of said streets which provided "that all streets in the said City of Berkeley will hereafter be repaired by the tax bill method either by the prior request of the resident property owners or by the order of the Board of Aldermen according to the due process of law established by the statutes of the State of Missouri, except for those streets which may be deemed arterial highways by the Board of Aldermen of the City of Berkeley, Missouri."

Thereafter, at a meeting of the Board of Aldermen held April 15, 1953, defendant Bangert requested authority from said Board to take over and operate the street department, and to outline and choose the work to be done on the streets, under the 60¢ tax bill method. Mr. Bangert stated that there would be no compensation to him, and that he would be responsible to the aldermanic committee in carrying on said work. The Board, by a majority vote, granted the authority requested, and on the following morning the Mayor started to work on the streets. The following streets were worked on: Graham Road, Carson Road, Country Day Lane, Evans Lane, and Berkeley Drive.

The manner and method of performing the work on said streets was detailed by defendant Bangert in a statement offered in evidence at the hearing below, the material portions of which are as follows:

"Berkeley Drive needed repairs over its entire length of some 2,700 feet. At the time that the work was commenced, this street was in very bad condition. The pavement was broken and irregular over its entire length. However, the original base rock of the street was still intact. On this street, as on all others, we went over the street in the condition in which we found it and applied a penetrating coat of MC–O asphaltic binding material. This material is more or less compact and solid in a cooled condition. It was delivered to the job on a trailer truck, heated to 300 deg. Fahrenheit, and applied under 150 pounds per square inch pressure through spray nozzles across the entire surface of the street in a quantity of .2 gallons per square yard. Thus, the street was sprinkled with very hot asphalt under pressure.

"After the first step was complete, that is, after the first sprinkling of binding material was applied, the street was still in an uneven and rough condition. The next procedure consisted of allowing the binding material to saturate the surface and impregnate the surface material for approximately a 24-hour period.

"On the day following, a Barber-Green asphalt spreader was used to spread the asphalt material on top of the binder coat. This machine is so constructed that we were able to spread the asphalt to a level surface graded out from zero to the required thickness of several inches in some depressions, depending upon the irregularities found in the surface of the street. The material used in this operation was known as pre-mixed asphaltic concrete, heated to the right degree, and applied in heated form to the surface of the street by the spreader, after which it was rolled with a ten ton roller within a matter of hours. These procedures were all that was done to Berkeley Drive.

"The holes in the street were not filled with rock or any other material by hand. The spreader took care of this in a single operation. No man power was used other than that required to operate the first sprinkling machine or tank truck and those used to operate the spreader and roller.

"*      *      *      *      *      *

"It will be noted that no rock was used on the Berkeley Drive project. On Country Day and Harmon Lane (formerly Brown Road), Evans Lane, Carson Road and Graham Road varying amounts of rock were used and purchased from the Westlake Quarry and the St. Charles Quarry.

"*      *      *      *      *      *

"The procedures as to the application of asphaltic binding material and asphaltic concrete mix and the eventual rolling thereof were followed exactly in the latter four projects after the deeper holes had been filled and leveled off with rock by hand labor consisting of city employees * * *.

" * · * * * · * · * "

"In all instances, whether rock was used to fill the chuck holes or not, the work was done and the material applied to the streets in the condition in which they were found. They were not scarified. They were not dug up. No new base material was put in. No sections were cut out at any place and replaced. No new ditches were built. No culverts were renewed and replaced, and no new culverts were put in. Nothing was done other than to place the existing traveled surfaces of the road in a usable condition by the methods above outlined."

There was also introduced in evidence a statement of Thomas H. Forcey, Asphalt Manager, St. Louis County Division of Highways. He first described the old method of patching each hole in the surface of a street by hand, which he characterized as a slow and inefficient method. He then stated:

"It is my understanding that the City of Berkeley, after careful consideration and study from an economic standpoint, evolved the method of patching in one complete operation. This was accomplished by first priming the existing surface with 2⁄10 of a gallon per square yard of MC–O cut-back asphalt, * * *. They then hauled hot mix asphaltic concrete from a central plant to the Barber-Green spreader, dumped the material into the spreader and then spread the material over the entire surface, * * *. In so doing they removed all irregularities in the surface of the road and accomplished the following results: they eliminated all holes, utility cuts, waves and depressions, and checked cracked sections. It is to be noted that the Barber-Green machine has a strike-off blade and the blade pulls the material forward so as to fill all the holes and spread the material evenly over the entire surface. The strike-off blade in its operation takes practically all the asphaltic concrete material off the high spots, leaving the original surface with nothing but a prime coat and filling in holes up to 5″ and 6″ in depth. In the last few days I have examined all the streets in question, I have seen where the new surfacing graduated out from zero (prime coat) to varying thicknesses as heretofore indicated.

" * * * * * * "

"My examination of these streets, since the work was done, shows me that the original base of the street was left intact and used as it was found by the City of Berkeley. The repair or maintenance work above described was applied solely and only to the surface and to the depressions or damaged portions thereof. The streets are now in what could be termed good, repaired condition, but are not the same as a new street in view of the fact that a new foundation or base was not applied. Furthermore, a new street would require proper elimination of surface water by adequate drainage. Ditching and culverts would be indicated. In order to do this the street would have to be completely re-aligned, culverts installed, ditches constructed, curves reduced, and new compact base material added or substituted to the existing base, as necessary. None of these things were done.

"From the evidence heretofore offered as I have heard and read it, and from what I have seen on the streets themselves, the work done between April 15, 1953, and June, 1953, consisted solely and entirely of repair work, commonly referred to by the engineering profession as 'maintenance'.

"The cost of a new, or even a reconstructed road in place of the old ones

on the streets would be many multiples of the cost of maintenance work or repairs which have been done.

" * * *, it will be noted that by the use of the various spreading machines or devices, containing a blade for leveling and a tamping bar, the speed and efficiency of applying the hot material to the surface of the road is greatly increased and the manpower is almost eliminated. It is another instance in which modern machinery has taken over the work of many men.

"By the old methods, it would have taken the City of Berkeley many months to patch the street from hole to hole and crack to crack at a greatly increased cost of application of the material. In the meantime the public would not have had the use of the improved thoroughfare.

" *      *      *      *      *      *

"In conclusion, it should be remembered that from the beginning of the development of bituminous surfacing in about 1905, down to the present date, bituminous materials have always been considered as maintenance or repair materials. They were developed for this purpose. * * *

"It will be further noted in the diagrams shown on Exhibit '4' that on roads using this material as a surfacing for new construction, the bituminous mixture is spread to a uniform thickness over the entire surface of the base, while in repair work the machinery used is so constructed that it can be spread from zero to varying thicknesses, according to the irregularities found in the surface of the old road to be repaired."

There was also introduced into evidence a statement by Walter A. Heimbuecher, City Engineer and Director of Public Works of University City, Missouri. The material portions of said statement are as follows:

"During the summer of 1953, in company with Mayor Bill Bangert, of Berkeley City, I examined several streets in Berkeley City upon which he told me he had done some improvement work during the spring of 1953, and which are involved in litigation. These were asphalt top streets, usually called 'black top'.

"Based upon my experience in street repair and construction work, the work done on these streets amounted only to a repair job, and cannot be called resurfacing or reconstruction, since in many places the original surface was left intact. Streets which contain holes and corrugated places can be repaired by hand labor, that is to say, a crew of men can fill up the holes with asphaltic material and in this way patch each hole and each rough place, but where holes and rough places are numerous in the surface of the street this is a very slow and expensive procedure. The modern and more economical way to repair the holes and rough places in streets which were in the condition that Mayor Bangert described to me, is to proceed as he did in repairing these streets, by using a mechanical spreading machine. By this method the work can be done at a fraction of the cost of doing it by hand labor, and it can also be done in much less time and result in a much smoother patch."

Wilfred Bangert gave the following testimony:

" * * * I consider the streets now in the condition of where they can now be re-surfaced. There is an even contour to the surface. The low depressions have been eliminated to average up with the high points that are not covered by the material, and to resurface these streets * * * would only require an additional floor of asphaltic binding material, to make the asphaltic concrete adhere to the surface, and then with a similar machine as we used to repair the streets, the material would be distributed on the surface to an average depth of * * * 2½

inches in the case of Carson Road, and two inches in the case of all others, to give a lasting effect of re-surfacing on these streets, * * *.

" * * * * * *

"As a man in the business of road construction I considered that there was only one alternative other than the method used, and that was the method that was * * * proposed to the Board of Aldermen, by Alderman Edward Walsh, and by the former City Engineer, Mr. Loelkes, which consisted of scarifying the present roadbed of, Carson Road, the full width, re-laying of the base floor so that we get to uniform contour, with material which may fit that surface; then on top of that there would be applied crushed stone at the thickness of three inches * * * the minimum of crushed stone the size of two and a half inches thick, equally distributed with what we call a blader, so that there would be no depressions, no irregularities, rolled with a roller not less than ten ton, and then when that is continued to a thickness of three inches the void in that stone would be filled with a screening and rolled, so that all the voids in this stone would be thoroughly filled up on this prepared surface of crushed stone, rolled, and there would have to be applied water, * * *. There would be applied not more than 2½ inches on Carson and less than two inches on the other streets, with asphaltic surface, and rolled with a self propelled machine.

" * * * * * *

"I would consider that (alternative method) a new construction.

" * * * * * *

"Q. And the work you actually did was only repair? A. Absolutely.

"Q. And your repair went only from one-quarter inch to six inches deep; was that it? A. Correct."

The costs of the improvements in question were as follows: Graham Road, $10,-249.13; Carson Road, $11,062.51; Evans Lane, $3,285.61; Country Day Lane and Harmon Lane, $9,892.81; and Berkeley Drive $4,948.86. The total costs were $39,-438.92.

Asphalt Mix, Inc., received $32,721.08 for the asphalt concrete furnished by it and was the only company which had been paid at the time the suit was filed on May 16, 1953.

The Missouri Petroleum Products Company furnished 11,900 gallons of MC-O cutback liquid priming asphalt for $1,844.50. The St. Charles Quarry Company and Westlake Quarry Company furnished 548 tons of rock.

There was a total of 3 and 9/10 miles of streets involved in the work in question, and a total of 4,500 tons of asphalt concrete was used.

Suit was filed on May 16, 1953. On May 18, 1953, the court issued its restraining order, restraining, among other things, the issuance of special tax bills for the work done. On May 20, 1953, the Board of Aldermen passed an ordinance authorizing the issuance of special tax bills for said work. The meeting at which this ordinance was passed lasted until sometime after midnight, and immediately after the meeting the members of the Board of Aldermen and the Mayor were served with the above mentioned restraining order. The City Clerk, John Taylor, was not named as a party defendant in this action, nor was he served with a copy of the temporary restraining order. Subsequent to May 21, 1953, and pursuant to the authority granted by the ordinance, the City Clerk issued special tax bills to abutting property owners for the work done on the streets in question for a total amount of $24,748.46.

Thereafter, upon plaintiffs' application, the City of Berkeley and John Taylor were ordered to show cause why they should not be punished for contempt of court for violating the court's order of May 18, 1953.

It was admitted by the defendants that no steps were taken by the City of Berkeley, or by the Board of Aldermen, or by

any of the defendants in their official capacity, to comply with the terms of Section 88.700 or Section 88.687 RSMo 1949, V.A.M.S. It was stipulated that said defendants did not comply with the provisions of Section 8.250 RSMo 1949, V.A.M.S.

By stipulation, the cause, on its merits, was submitted on one issue, namely, whether the City of Berkeley should have complied with the formalities prescribed by Section 8.250 RSMo 1949, V.A.M.S., before making said improvements, or whether the work authorized and done constituted merely a repairing of said streets, which could, under Section 88.703 RSMo 1949, V.A.M.S., be lawfully done without notice or compliance with any of the formalities required by Sections 8.250 and 88.700.

The issues raised by the citation for contempt issued against defendant City of Berkeley and John Taylor were submitted at the same time the cause was submitted on the merits.

The court found for defendant City of Berkeley and John Taylor in the contempt proceeding, and for all defendants on the merits, and by a single judgment discharged said defendants on the contempt charge, dissolved the temporary injunction, denied a permanent injunction, and dismissed the petition at plaintiffs' costs.

Appellants urge that they are entitled to relief for the reason that the City of Berkeley, in contracting for the work, failed to comply with the provisions of Section 8.250 RSMo 1949, V.A.M.S. The text of said section is set out in the footnote below.[1] Specifically, it is contended that the defendant City acted illegally in authorizing and contracting for said improvements without first advertising for bids, in accordance with the provision of said statute. Respondents deny that said section is applicable, citing and relying on Dunham Construction Co. v. City of Webster Groves, 231 Mo.App. 1089, 84 S.W.2d 183, a decision of this court in which we held that Section 8.250 was not applicable to cities containing less than 500,000 inhabitants. Appellants assert in reply that said decision is unsound and should be overruled. Whether this is so we need not decide, for the reason that Section 8.250 is inapplicable for reasons other than the one announced in the Dunham case, supra.

The General Assembly has by various sections in Chapter 88, RSMo 1949, V.A.M.S., dealt specifically with the subject of street improvements and repairs in cities of the fourth class. By Section 88.700 the formal requisites and preliminary steps necessary to a lawful exercise of the power of such a city with respect to paving, macadamizing, guttering and curbing of its streets is set out in detail. By Section 88.703 it is provided that no formality shall be required to authorize the repairing of streets or paving, etc. These special statutes conflict with Section 8.250 and, for

[1] "No contract shall be made by an officer of this state or any board or organization existing under the laws of this state or under the charter, laws or ordinances of any political subdivision thereof, having the expenditure of public funds or moneys provided by appropriation from this state in whole or in part, or raised in whole or in part by taxation under the laws of this state, or of any political subdivision thereof containing five hundred thousand inhabitants or over, for the erection or construction of any building, improvement, alteration or repair, the total cost of which shall exceed the sum of ten thousand dollars, until public bids therefor are requested or solicited by advertising for ten days in one paper in the county in which the work is located; and if the cost of the work contemplated shall exceed thirty-five thousand dollars, the same shall be advertised for ten days in the county paper of the county in which the work is located, and in addition thereto shall also be advertised for ten days in two daily papers of the state having not less than fifty thousand daily circulation; and in no case shall any contract be awarded when the amount appropriated for same is not sufficient to entirely complete the work ready for service. The number of such public bids shall not be restricted or curtailed, but shall be open to all persons complying with the terms upon which such bids are requested or solicited."

that reason, said special statutes must prevail, for it is a well settled principle that where one statute deals with a subject in general terms, and another deals with a part of the same subject matter in a more minute and definite way, the latter must prevail over the former, in the event there is repugnancy between them. State ex rel. City of Springfield v. Smith, 344 Mo. 150, 125 S.W.2d 883; Fleming v. Moore Bros. Realty Co., 363 Mo. 305, 251 S.W.2d 8; State ex rel. McKittrick v. Carolene Products Co., 346 Mo. 1049, 144 S.W.2d 153; Tevis v. Foley, 325 Mo. 1050, 30 S.W.2d 68; State v. Mangiaracina, 344 Mo. 99, 125 S.W.2d 58; State ex rel. R. Newton McDowell, Inc. v. Smith, 334 Mo. 653, 67 S.W.2d 50; State ex rel. Hyde v. Buder, 315 Mo. 791, 287 S.W. 307; Folk v. City of St. Louis, 250 Mo. 116, 157 S.W. 71; State ex rel. Equality Sav. & Bldg. Ass'n v. Brown, 334 Mo. 781, 68 S.W.2d 55.

■ The sole question left for determination is, was the work involved here a "resurfacing" or a "reconstruction" of the paving or macadamizing, or was it simply a "repairing" of the streets. If it was a "resurfacing" or a "reconstruction", then it was incumbent upon the Board of Aldermen to comply with the terms of Section 88.700. Said Section, among other things, provides for a resolution by the Board declaring such work or improvement necessary, publication of said resolution in some newspaper published in the City, advertisements for bids, and the awarding of the contract for the work to the lowest and best bidder upon plans and specifications filed therefor by the City Engineer or other officer designated by the Board with the City Clerk. There was no attempt on the part of the Board of Aldermen in this case to comply with said statute.

■ If the work done was simply a repairing of the streets, then under Section 88.703 none of the above formalities were required.

After a careful consideration of the evidence in this case we have concluded that the work done on the streets in question constituted merely repairs.

In Webster's New International Dictionary (2nd Ed.), the word "repair" is defined as "restoration to a sound or good state after decay, dilapidation, injury, loss, waste, etc." The term "reconstruct" is defined as "to construct again; to rebuild"; and the word "resurface" is defined as "to provide with a new or fresh surface."

■ It appears from the evidence that the original base of the street was not disturbed. It also appears that the original surface was not removed or scarified, and that the materials were applied to the paving in its then condition, in various depths or thicknesses, sufficient to fill the holes and depressions and bring the streets back to their original condition and contour. The streets were not provided with a new surface, nor were the streets or the paving thereon reconstructed, as those words are commonly understood. The effect was merely to restore the paving to a sound condition by the use of modern machinery. There was no rebuilding or providing of new surfaces, but simply a filling up of the holes and depressions so that said streets presented a smooth and even appearance.

A case very much in point is City of Covington v. Bullock, 126 Ky. 236, 103 S.W. 276. In that case the question presented was whether a certain improvement made to a street was a "repair" or a "reconstruction". The work was done pursuant to an ordinance which provided that the street was "ordered to be reconstructed with asphalt paving * * *. The resurfacing with asphalt paving hereby ordered to be done shall be the portion of the street used as a roadway between the faces of the curb." The entire foundation of the street, which was 6½ inches deep, was left intact. The curbing remained unaltered. The 3-inch asphalt coating which had become rotten and worn was removed and replaced by a new coating of asphalt 3 inches thick. The court held that the improvement was a "repair" and not a "reconstruction". After setting out the dictionary definition of the two words, "repair" and "reconstruction", the court said:

"Under this definition, if the improvement consists in merely restoring

the street to a good, serviceable condition by replacing such parts as are destroyed, the work is in fact but 'repairing', no matter how extensive this work may be. If, on the other hand, the entire street is torn up and rebuilt, or built over again, the work is 'reconstruction'. * * * The fact that the covering has become worn or decayed, so as to necessitate its being replaced, cannot be regarded as a 'reconstruction' of the street. It is but a resurfacing, a repairing. 'Construct' means to build; 'reconstruct' means to rebuild, to build over again; and a street is not 'reconstructed' by being resurfaced either in whole or in part.

"*     *     *     *     *     *

"It can hardly be said that a street is reconstructed when more than two-thirds of the old work is left intact, and the new work consists in merely removing some decayed and worn material from the surface of the street and replacing it with new material.

"*     *     *     *     *     *

"The question which is at last presented for determination in each particular case is this: Is the improvement a 'repair', or is it a 'reconstruction'? If the old skeleton or framework of the original structure is retained, and the worn parts are replaced with new material of the same or kindred sort, it comes clearly within the definition of 'repair'. If, on the other hand, the old structure is torn away, and a new one erected in place thereof, even though on the same general plan, then it is clearly a 'reconstruction' * * *."

The principle announced in the foregoing case was applied by the Kansas City Court of Appeals in Parker-Washington Co. v. Meriwether, 172 Mo.App. 344, 158 S.W. 74.

We have carefully considered the cases cited and relied on by appellants but find they are not in point on the facts here involved, and do not alter our opinion that, under the facts, we must hold that the work on the streets in question constituted repairs.

Appellants next contend that the trial court erred in failing and refusing to find the City of Berkeley and John Taylor, City Clerk, guilty of contempt for violating the court's temporary restraining order. The violation alleged was the issuance of the special tax bills after having been served with said restraining order.

It was stipulated at the hearing that the ordinance authorizing the issuance of the tax bills was enacted at a meeting of the Board of Aldermen held May 20, 1953. The meeting lasted until sometime after midnight, and immediately after adjournment the Mayor and Board of Aldermen were served with the restraining order. Several days thereafter the City Clerk issued the tax bills.

There was no evidence that the Clerk at the time he issued the tax bills had actual knowledge of the restraining order. It is argued, however, that all city employees are presumed to have had notice of the restraining order after service thereof upon the Mayor and Board of Aldermen, and that the issuance of the tax bills thereafter was a contempt of court.

Appellants also make the point that the City had notice of the restraining order prior to the meeting of May 20th by reason of the knowledge of its Mayor who, appellants claim, knew before the meeting that the restraining order had been issued, because he made reference to it at said meeting.

Respondents contend that the evidence fails to show that the Mayor had knowledge of the restraining order prior to the passage of the tax bills, and that since tax bills should be considered issued as of the date of the ordinance, there clearly was no contempt shown. It is unnecessary for us to determine the issues raised by this assignment for the reason that the appeal in this case does not bring up for review the trial court's ruling on the citation for contempt. The charge of contempt was brought, not to force compliance with any

order of the court, but to punish the parties alleged to be in contempt for an act of disobedience. It was, therefore, a proceeding in criminal contempt. In such a proceeding we have no power to review the action of the trial court with reference thereto. Ex parte Crenshaw, 80 Mo. 447; Limerick v. Riback, 204 Mo.App. 321, 224 S.W. 45; Holt v. McLaughlin, 357 Mo. 844, 210 S.W.2d 1006; Wingert v. Kieffer, 4 Cir., 29 F.2d 59.

In our opinion the trial court reached a correct result in this case. The judgment appealed from is affirmed.

MATTHES, J., and JAMES D. CLEMENS, Special Judge, concur.